# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**PEGGY ANKROM,**
      **Plaintiff,**

**v.**
                                        **Civil Action No. 5:08CV120**
                                        **(Judge Stamp)**

**MICHAEL J. ASTRUE, COMMISSIONER OF**
**SOCIAL SECURITY,**
      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Peggy Ankrom ("Plaintiff") filed an application for DIB on October 23, 2000, alleging disability as of January 1, 1998, due to disc problems, neck pain, back pain, spastic colon, poor circulation in right leg with leg pain, and fibromyalgia (R. 68). The Social Security Administration denied Plaintiff's claim at the initial and reconsideration levels (R. 29, 30). Plaintiff requested further review, and Administrative Law Judge Elliot Bunce ("ALJ") held an administrative hearing on June 5, 2002 (R. 292). Plaintiff, who was represented by counsel, appeared and testified, as did a Vocational Expert ("VE"). On September 27, 2002, the ALJ denied Plaintiff's claim, finding that Plaintiff was not disabled within the meaning of the Social Security Act on or before her date last

insured, September 30, 2000 (R. 9-19). The Appeals Council denied Plaintiff's Request for Review on October 24, 2002, making the ALJ's decision the final decision of the Commissioner (R. 8).

Plaintiff filed a Complaint with this Court on June 6, 2003. See Case No. 5:03cv78 (Docket Entry 1). The Commissioner filed her Answer on August 5, 2003. Plaintiff filed her Motion for Summary Judgment on September 11, 2003, and Defendant filed her Motion for Summary Judgment on January 20, 2004. On April 2, 2004, United States Magistrate Judge James E. Seibert entered a Report and Recommendation/Opinion (5:03cv78 Docket Entry 7)( 5:08cv120 R. 353). Magistrate Judge Seibert found that Plaintiff's mental impairments were not diagnosed until after her insured status had expired, and therefore, the ALJ did not err when he excluded her mental impairments in his hypothetical to the VE (R. 383-384). The Magistrate Judge further found that substantial evidence supported the ALJ's determination that Plaintiff's impairments limiting her ability to ambulate, even when combined, did not completely limit her ability to perform work (R. 386). He also found that substantial evidence supported the ALJ's finding that Plaintiff's obesity, even combined with her other impairments, left her able to perform limited light work (R. 387). The Magistrate Judge further found that substantial evidence existed for the ALJ's finding that Plaintiff's gastroesophageal reflux disease and history of hiatal hernia, even when combined with her other impairments, left her able to perform limited light work (R. 387).

Magistrate Judge Seibert, however, found that the ALJ's conclusion that Plaintiff did not display "the necessary symptoms of fibromyalgia" was improper, as the ALJ cited no medical evidence contrary to Plaintiff's treating sources, who all found she suffered from fibromyalgia (R. 388). He then found that the error required remand "for it is unclear whether the Claimant's fibromyalgia alone, or in combination with other impairments, prevents her from engaging in

2

employment" (R. 389). Magistrate Judge Seibert Recommended the action be remanded to the Commissioner to consider Claimant's fibromyalgia in accordance with 20 CFR section 404.1520. Magistrate Judge Seibert instructed the parties that if they objected to any portion of the findings of fact and recommendation for disposition, they must file written objections within ten days after being served with a copy of his recommendation.

On April 16, 2004, the Commissioner filed an Objection to the Report and Recommendation, objecting solely to the Magistrate Judge's recommendation regarding fibromyalgia. (Case No. 5:03cv87 Docket No. 8). Plaintiff did not file any Objections to the Magistrate Judge's Recommendation, but did file a Response to Defendant's Objection on April 28, 2004 (Case No. 5:03cv87, Docket No. 9), requesting the District Judge adopt the Magistrate Judge's Report and Recommendation.

On June 15, 2004, United States District Judge Frederick P. Stamp entered an "Order Affirming and Adopting the Report and Recommendation of the Magistrate Judge" (Case No. 5:03cv78, Docket Entry 10) (Case No. 5:08cv120 Docket R. 390). Pursuant to 28 USC section 636(b)(1)(C), the Court conducted a de novo review of the portion of the recommendation to which objection was made. The Court agreed with Magistrate Seibert that the ALJ's finding regarding Plaintiff's fibromyalgia claim was not supported by substantial evidence, and that the case should therefore be remanded to the ALJ "in order that the plaintiff's fibromyalgia claim may be properly analyzed with respect to her disability" (R. 394). The District Judge affirmed and adopted Magistrate Judge Seibert's recommendation in its entirety and remanded the case to the Commissioner for specific findings in accordance with the Report and Recommendation. Case No. 5:03cv8 was subsequently closed.

On July 28, 2004, Defendant sent Plaintiff's Counsel a "Notice of Order of Appeals Council Remanding Case to Administrative Law Judge . . . . [b]ased on the court's order . . . . " (R. 395).

Plaintiff submitted additional evidence to the ALJ, which is discussed below. On January 12, 2005, ALJ Bunce held a second Administrative Hearing regarding Plaintiff's claim (R. 436). Plaintiff, who was again represented by an attorney, was present and testified. Vocational Expert ("VE") Charles Cohen, Ph.D. also testified. On January 27, 2005, ALJ Bunce entered an Order finding that on or before September 30, 2000, Plaintiff had the residual functional capacity to perform a significant range of light work, and that she was not under a disability, as defined in the Act, at any time through the date of this decision (R. 342). The Appeals Council denied Plaintiff's Request for Review on May 24, 2008, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review (R. 319). Plaintiff, now proceeding *pro se*, filed the current Complaint on July 25, 2008.

## II. The Prior Court Decision and Newly-Submitted Evidence

Plaintiff was born on April 11, 1961, and was therefore 39 years old on the date her insured status expired. She was 41 years old on the date of the first Administrative Hearing and 43 on the date of the second Administrative Hearing, neither of which is relevant to the question of disability at the time she was last insured on September 20, 2000. According to the non-refuted prior Report and Recommendation, she has a high school education and past relevant experience as a cashier. Neither party objected to the facts contained in Magistrate Judge Seibert's Report and Recommendation, although the Commissioner objected to the legal conclusion based on those facts. The only objection was to the issue of fibromyalgia. Any other objections were therefore waived. Still, the District Judge reviewed the other issues and adopted and affirmed the Report and

Recommendation in its entirety. No appeal was taken from that decision. The claim was remanded to further consider the issue of Plaintiff's fibromyalgia, and the Appeals Council remanded to the ALJ to conduct a second hearing and reconsider based on the court's findings. The undersigned therefore finds the sole issue remaining in this matter is whether substantial evidence supports the ALJ's second determination that Plaintiff's fibromyalgia, alone or in combination with her other impairments, did not render Plaintiff disabled on or before September 30, 2000. The undersigned therefore sets forth the Medical Records he deems relevant to the issue of Defendant's fibromyalgia or related pain on or before that date.

On September 2, 1997, Plaintiff presented to Gary Hanson, M.D., her family doctor, apparently for the first time in three years, "because I am back on her insurance" (R. 122). Plaintiff said she had been having a great deal of trouble with her neck and right shoulder. She received injections from time to time which helped "some." Upon examination, Dr. Hanson found Plaintiff was "[v]ery tender in trigger points about her shoulders & neck, consistent with fibromyalgia." He diagnosed fibromyalgia, irritable bowel syndrome, and obesity and prescribed Flexeril, corticosteroid injections from time to time as needed, strongly advised weight loss, and gave her information on fibromyalgia "in regards to exercise etc."

On October 24, 1997, Plaintiff presented to Dr. Hanson with complaints of foot and ankle discomfort on and off (R. 121). She also had neck and shoulder pain with arm movement. She didn't like the side effects of Flexeril so she had stopped taking it. She took "a great deal of Ibuprofen."

On December 5, 1997, Plaintiff presented to Dr. Hanson with complaints of "continue[d] significant problems with her fibromyalgia" (R. 121).

5

Plaintiff's alleged onset date is January 1, 1998.

On January 12, 1998, Plaintiff presented to Dr. Hanson stating she "developed left lower back pain acutely a few days ago" (R. 120). It got better, then much worse. She was in a lot of pain. She had no injury. Upon examination, Plaintiff had a great deal of tenderness over the left lumbosacral area. Dr. Hanson injected her with Depo-Medrol. He was unable to elicit knee jerk or ankle jerk bilaterally. He assessed acute low back pain, unlikely to be due to disc disease.

On March 15, 1998, Plaintiff presented to Dr. Hanson complaining of continued "significant problems with her fibromyalgia" (R. 121). Dr. Hanson injected the right trochanteric bursa with Depo-Medrol. He diagnosed obesity, nicotine addiction, GERD, and fibromyalgia. He strongly encouraged Plaintiff to lose weight and stop smoking.

On April 3, 1998, Plaintiff told Dr. Hanson she continued to have a great deal of neck pain (R. 119). She said Ibuprofen did not really help. She asked about an MRI. The doctor did not believe this would really help and referred her to a chiropractor. There are no records of chiropractic evaluation or treatment in the record, however.

Six months later, on October 13, 1998, Plaintiff presented to the ER with complaints of low back pain with radiation to the top of her hip (R. 125). She had some pain with straight leg raising at 45 degrees of the right leg. Physical examination revealed good reflexes and good pulse. Plaintiff was given a Medrol Dose Pack and Soma. She felt better after treatment. She was advised to use ice for her back for the first 24 hours, then heat. The final impression was acute back pain and a history of disc disease.

On March 25, 1999, Dr. Joseph Endrich, M.D., Plaintiff's subsequent family physician, treated Plaintiff for severe back pain radiating to both hips (R. 190). He diagnosed osteoarthritis and

prescribed Soma, anti-inflammatories, and Ibuprofen, and referred Plaintiff for x-rays and MRI's of the hip and back.

A hip x-ray on March 27, 1999 was negative (R. 212). A lumbar spine x-ray the same date showed "moderate degree of degenerative spondylosis involving the mid-lumbar segment, otherwise negative" (R. 212).

An MRI of the lumbar spine on May 8, 1999, showed a small central disc herniation at L3-4, causing a mild indentation on the thecal sac, a small right paracentral disc herniation at T11-12, causing a mild indentation on the thecal sac, and disc bulges at L2-3 and 4-5 (R. 210).

Plaintiff saw Dr. Endrich on June 17, 1999, with complaints of bilateral hip pain, chronic shortness of breath, neck pain for three years with muscle spasms for two weeks, and right middle finger "sticking" (R. 187).

A cervical spine x-ray on June 25, 1999, showed a "questionable" partial encroachment at the C3-4 foramina on the right, "but this is otherwise unremarkable" (R. 209).

Plaintiff saw Dr. Endrich on July 1, 1999, for low back pain radiating to both hips (R. 186). He reviewed the June 25th cervical spine x-rays, and May 8th lumbar spine MRI, finding they showed several areas of disc herniation with indentation of the thecal sac and "possible" foramen encroachment in the cervical spine. He diagnosed herniated disc and osteoarthritis.

On December 2, 1999, Plaintiff presented to Dr. Endrich for complaints of neck pain and shoulder pain, with right arm pain, numbness, and tingling the doctor thought was "quite compatible with cervical radiculopathy" (R. 180). He noted the cervical spine x-rays "showed foramen encroachment" and diagnosed cervical radiculopathy.

A cervical spine MRI on December 7, 1999, based on Plaintiff's history of fibromyalgia and

pain and numbness in both arms, was negative (R. 208), except for mild sphenoid sinusitis.

On March 7, 2000, Plaintiff presented to Dr. Endrich with complaints of muscle spasms in her neck and pain in the right leg from the knee down (R. 177). Her examination was unremarkable. Plaintiff wanted a referral to a rheumatologist, however. Dr. Endrich then diagnosed fibromyalgia and referred her to rheumatology.

On June 13, 2000, Plaintiff presented to rheumatologist Ghassan Alayli upon referral by Dr. Endrich, for her complaints of "multiple aches and pains of a few years duration" (R. 143). She reported she had been diagnosed with fibromyalgia two years earlier. The doctor noted that "[a]pparently Dr. Hanson has diagnosed her in the past as having fibromyalgia and she wants to come here to see if she really has it and what she can do about it and can she be eligible for disability."[1] She said she had had chronic back pain for several years, and her back "goes out." "Every now and then they tell her that she has sciatica." MRI basically revealed small disc herniation at multiple levels. She usually went to the ER every now and then where they gave her muscle relaxer shots for pain. She reported that a few years ago she started having diffuse body aches and pains mainly in the neck. Usually it hurt when she was "overdoing things," like groceries or cleaning, with her head lifted up. She never had any arm pain and denied arm numbness or weakness, but the neck pain did radiate to the shoulder area. Her shoulders did not really bother her, however. She said her hands did not really bother her, but occasionally her elbows bothered her. Her knees bothered her occasionally if going up steps, but "nothing really significant." Her ankles and feet also occasionally bothered her. Her hips gave her a lot of problems, however. "Basically,

[1]Interestingly, Plaintiff was referred by Dr. Endrich, not by Dr. Hanson, and Dr. Endrich only diagnosed Plaintiff with fibromyalgia upon her request for referral to a rheumatologist.

she said that the whole body can feel like a toothache." She didn't sleep well and was always tired, but never well rested. She felt drugged out and foggy sometimes. She took Ibuprofen, and took too much. The worst part of her day was "after doing things" and her disease activity fluctuated.

Upon examination, Plaintiff had fairly good range of motion of the cervical spine. The thoracic spine was unremarkable. The lumbosacral spine had no point tenderness. She refused range of movement testing of the lumbosacral spine, however, saying it would "send her back out." Straight leg raising was negative. Her hands, wrists, elbows, and shoulders were unremarkable. Her hips had good ranges of motion with tenderness of the trochanteric bursa. There was crepitation of the right knee, but the left knee and both ankles and feet were unremarkable.

Dr. Alayli diagnosed fibromyalgia, mild osteoarthritis of the right knee, history of GERD, "and history of apparently depression but never officially diagnosed." He gave her a booklet on fibromyalgia and discussed it with her briefly. He would send her for neck and knee x-rays and routine blood work.

On July 11, 2000, Plaintiff presented to Dr. Alayli for follow up (R. 141). She had read a book about fibromyalgia and said "it fit her to a great deal." Dr. Alayli discussed with her the importance of exercise, sleep medications, and anti-depressants. He gave Plaintiff a prescription for Pamelor and told her to try to do stretching exercises. She said she had a swimming pool and would do that. Plaintiff said she was going to try to apply for another job, and Dr. Alayli told her he "would usually encourage patients with fibromyalgia to be always engaged in employment if possibly" [sic]. This record is the last regarding fibromyalgia or back pain before Plaintiff's date last insured of September 30, 2000. It is the last before Plaintiff applied for disability on October 23, 2000. It is also the last in the record before the State agency RFC nine months later.

On April 10, 2001, State agency reviewing physician Fulvio Franyutti, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC"), finding Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, could stand and/or walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday (R. 213-214). Her push/pull was limited to what she could lift/carry. She could occasionally perform all postural movements. She had no manipulative, visual or communicative limitations. She had no environmental limitations except she should avoid concentrated exposure to extreme cold. Dr. Franyutti found Plaintiff's symptoms were attributable to medically determinable impairments, and reduced her RFC to light.

On April 10, 2001, State agency reviewing physician L. Dale Simmons, M.D. reviewed the records and affirmed Dr. Franyutti's RFC (R. 220).

The remaining medical records regarding fibromyalgia or back/neck/hip pain are all from months after Plaintiff's date last insured.

On May 2, 2001, eight months after her date last insured and ten months after her last recorded medical evaluation or treatment, Plaintiff presented to Dr. Endrich with complaints of left hip pain (R. 167). She said this had been a problem since April 25, 2001 (seven months after her date last insured). On examination, Plaintiff had tenderness over the trochanteric bursa. Dr. Endrich diagnosed trochanteric bursitis and prescribed Ibuprofen. Plaintiff declined a pain injection.

An x-ray of the left hip on May 2, 2001, was negative (R. 204).

On May 11, 2001, Plaintiff presented to Dr. Endrich with complaints of severe low back pain (R. 166). He diagnosed low back pain and ordered a lumbar spine x-ray.

A lumbar spine x-ray on May 11, 2001 showed "mild degenerative change" (R. 203).

On May 18, 2001 (eight months after her date last insured), Plaintiff presented to Dr. Endrich

10

with complaints of refractory back pain (R. 165). She said she could not stand for more than an hour or so without a burning, aching sensation in the low back. She said she was in severe pain. She was unable to continue with activities due to this and was sent for an MRI.

A lumbar spine MRI on June 5, 2001, showed a small central disc herniation at L3-4 and mild disc bulges at L2-3 and L4-5 (R. 202).

On September 19, 2001, State agency reviewing physician L. Dale Simmons completed an RFC, finding Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, could stand/walk about 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday (R. 236). Her push/pull was limited only by the amount she could lift/carry. She could only occasionally perform all posturals. She had no manipulative, visual or communicative limitations, but should avoid concentrated exposure to extreme cold and heat and hazards (R. 239). Dr. Simmons found Plaintiff's symptoms attributable to medically determinable impairments. He reduced her RFC to light.

On March 6, 2002, Plaintiff saw Amar Khurana, M.D. for Dr. Endrich (R. 291). She reported a rash. The doctor reassured her about the rash, and gave her Claritin. He continued her on Soma "as needed" for fibromyalgia and Prilosec for GERD.

On April 19, 2002, Plaintiff presented to Dr. Endrich (R. 289). She seemed extremely upset, anxious and depressed. She had multiple somatic complaints, including muscle spasms in the neck and shoulder, right knee pain and swelling, exhaustion, shortness of breath, overweight, and smoking too much. She was "[w]orried about most everything in general." Upon examination, the doctor found stigmata of osteoarthritis and crepitation in the right knee with flexion extension. His impression was obesity, peptic acid disease, "history of" fibromyalgia, and small airway disease versus COPD secondary to ongoing nicotine use. He ordered labs to evaluate her complaints of

lethargy.

On May 6, 2002, Plaintiff followed up with Dr. Endrich regarding her lab results (R. 290). She was "still in a lot of pain" and agreed to treatment for depression. The only diagnosis was depression.

At the first Administrative Hearing on June 5, 2002, Plaintiff testified she could stand for probably 20 minutes before she would need to sit. She could sit about 45 minutes before she would need to stand. She could only walk about three minutes before she became short of breath.

The ALJ denied disability by decision dated September 27, 2002, and the Appeals Council denied reconsideration on October 24, 2002. Plaintiff filed her first Complaint with this Court on June 6, 2003. The District Court affirmed and adopted the Magistrate Judge's Report and Recommendation on June 15, 2004, agreeing with Magistrate Seibert that the case should be remanded to the ALJ "in order that the plaintiff's fibromyalgia claim may be properly analyzed with respect to her disability" (R. 394).

The following evidence was submitted in the current claim, subsequent to the remand of the case to the Commissioner.

On July 21, 2004 (four years after her date last insured), Plaintiff underwent MRI's of her lumbar spine and pelvis based on her complaints of low back pain radiating to right hip, and right-sided pain (R. 432-433). It was first noted that the MRI of the lumbar spine was "[s]omewhat limited . . . due to patient's large body habitus." There were, however, findings "suspicious for" far lateral disc herniation to the right at the L4-5 level. It further indicated that impingement on the exiting right L4 nerve root "may be present." Degenerative changes were present in the lower lumbar spine. The Pelvic MRI was unremarkable.

On December 19, 2004, Joseph Endrich, M.D., Plaintiff's current treating physician and her physician at the time of the earlier decision, completed a "Physical Capacity Evaluation" form (R. 426). At the top of the form is written the words: "As of or prior to 9/30/00," which is Plaintiff's date last insured. Dr. Endrich checked off boxes showing that Plaintiff could have stood less than one hour in an eight-hour workday; walk less than two hours in an eight-hour workday, and sit less than three hours in an eight-hour workday four years earlier. She could occasionally have lifted/carried a maximum of less than ten pounds. She could have used her hands for repetitive grasping and handling and fine manipulation and fingering, but not for pushing and pulling. She could not have used her feet for repetitive movements such as in operating foot controls. She could have occasionally bent, climbed stairs, and climbed ladders, but could never have knelt, squatted, or crawled. She could have reached above shoulder level.

Dr. Endrich also completed a Mental Residual Functional Capacity form (also as of September 30, 2000), opining that Plaintiff had no impairment in her ability to carry through instructions and compete tasks independently; be aware of normal hazards and take necessary precautions; and maintain personal appearance and hygiene. She would have mild impairments in her ability to accept instruction from and respond appropriately to supervisors; work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; respond appropriately to co-workers or peers; relate to general public and maintain socially appropriate behavior; maintain attention and concentration for more than brief periods of time; and remember locations and workday procedures and instructions. She would have moderate impairments in her ability to perform and complete work tasks in a normal work day or week at a consistent pace; work in cooperation with or in proximity to others without being distracted by them; perform at production

levels expected by most employers; respond appropriately to changes in work setting; behave predictably, reliably and in an emotionally stable manner; and tolerate customary work pressures (R. 428-431). She had no marked limitations. Dr. Endrich also checked "yes" in response to the question of whether Plaintiff's condition was likely to deteriorate if she was placed under stress, particularly that of a job. Where asked why and if this had occurred in the past, Dr. Endrich wrote: "Moderate to marked inability to interact with fellow workers in appropriate manner."

On December 21, 2004, Plaintiff underwent a radiological study and Doppler Venous Study of her legs for complaints of bilateral leg swelling and coolness, right worse than left (R. 435). The x-rays showed no evidence of lower extremity deep venous thrombosis (R. 435). The Doppler study showed no significant iliac artery stenosis; mild to moderate bilateral superficial femoral artery stenosis, right greater than left; and mild bilateral infrapopliteal vascular disease (R. 434-435).

On January 12, 2005, ALJ Bunce held a second hearing at which Plaintiff, again represented by counsel, testified (R. 436). Also testifying was Vocational Expert ("VE") Charles Cohen, Ph.D. The parties again agreed that the last day Plaintiff enjoyed insured status for DIB purposes was September 30, 2000 (R. 440). Plaintiff testified she still treated with Dr. Endrich, who was her family care doctor (R. 441). Plaintiff testified that her fibromyalgia had been "about the same" in 2000 as it was now (R. 443). She was still taking the same medications she took at the relevant time. She had been taking Amitriptyline for sleep and depression for about a year, however. She was now, and since the relevant time period, taking prescription Ibuprofen for her fibromyalgia pain and pain in her neck, stating, "When it gets real bad, that's the only thing that works." She was taking about the same amount as she had at the relevant time, which was "more or less based on [her] activity level" (R. 444). She did not take the same amount regularly, because she said she was afraid

14

she would become immune to it. She took it "only when the pain is so bad I can't stand it anymore." She said she could not take narcotics or anything with codeine due to allergies, so the Ibuprofen was the only thing that helped.

When asked how often she took the Ibuprofen, she again stated it depended on her activity level. She said she might take up to three pills a day six days a month. Sometimes she needed three pills a day for up to two weeks in a month (R. 445).

At the hearing held in 2005, Plaintiff testified that she believed that in 2000, she would have been able to stand only about ten minutes at a time, due to her lower back problems (R. 447). She felt she could sit about ten minutes at a time in a regular chair, as opposed to her recliner. She believed she could walk about 15 minutes at the most (R. 448). She had no idea how much she could lift or carry because she tried not to lift or carry anything, because anything she used her arms for "is what causes the severe pain in my neck" (R. 448). She testified she laid down for about three hours in the afternoon on a typical day (R. 450). She also testified she could not drive due to pain.

### III. Administrative Law Judge Decision

In his second Decision, ALJ Bunce provides as follows regarding Plaintiff's fibromyalgia:

> The court noted that in my earlier decision I had found fibromyalgia to be a severe impairment but had not supported my finding that it was not disabling. The objective medical evidence of fibromyalgia on or before September 30, 2000, is rather sparse. Gary Hanson, M.D., a treating physician, diagnosed fibromyalgia in September 1997 after locating trigger points. . . . In March 1998 he noted "significant problems" with the fibromyalgia but did not elaborate . . . , and he mentioned the condition in April 1998 . . . . The most-thorough evaluation of the claimant's fibromyalgia on or before September 30, 2000, is by Ghassan Alayli, M.D., who examined the claimant in June 2000 on referral from Dr. Endrich . . . . The claimant said that she had pain in several areas, including her back, and that she had to be careful using her back. Dr. Alayli found positive pulses but no pitting edema in the extremities. The claimant had fairly good range of motion in the cervical spine. Her thoracic spine was unremarkable. Dr. Alayli found no point tenderness in the lumbosacral spine, but the claimant refused range of movement in that area. His examination of her hands, wrists,

elbows, and shoulders was unremarkable. Her hips had good range of motion, with tenderness over the trochanteric bursa. Her left knee had some crepitation; the right knee, ankles, and feet were unremarkable. Dr. Alayli's diagnoses included fibromyalgia and mild osteoarthritis of the right knee. In July 2000 . . . , he noted that the claimant would be treated with medication and exercise. My review of the record does not disclose additional treatment or evaluation of the claimant's fibromyalgia on or before September 30, 2000. In May 1999 some degenerative disc disease was found in the claimant's back . . . .

I find that the RFC adopted here, which limits the claimant to light and sedentary exertion and provides for no more than occasional postural movements, sufficiently accommodates the limitations imposed by the claimant's fibromyalgia and back on or before September 30, 2000. Dr. Alayli found tenderness, but the claimant's strength and range of motion was certainly consistent with light and sedentary exertion. At her January 2004 hearing, the claimant testified that by September 30, 2000, these conditions were severe enough to prevent even these levels of exertion. The condition reasonably may have been expected to have caused pain and some limitation by September 30, 2000, but Dr. Alayli's examination, the most thorough before the claimant lost her insured status and performed less than four months before that date, shows that the claimant had lost little functional capacity, certainly not sufficient to rule out light and sedentary work.

The Court notes the weight to be given to a treating physician's opinion of disability. On or before September 30, 2000, no treating physician, including Dr. Endrich, concluded that the claimant was disabled. In December 2004, Dr. Endrich completed a form evaluating the claimant's physical capacity and headed "As of or prior to 9/30/00" . . . . On the form, Dr. Endrich checked blocks indicating that the claimant could not walk, stand, and sit a total of eight hours in an eight-hour day and could lift and carry less that [sic] 10 pounds. Somewhat contradictorily he found that the claimant could have performed repetitive grasping and handling. I have given the form little weight under Social Security Ruling 96-2p. Dr. Endrich cites no supporting medical evidence. Indeed his records on or before September 30, 2000, address a period before the claimant alleged her disability began . . . . the balance of his records address a period after her insured status elapsed . . . . The other medical evidence on or before September 30, 2000, as discussed, does not support his conclusion. . . . .

## IV. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether

the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## V. Discussion

For the benefit of the *pro se* Plaintiff, the undersigned is compelled to reiterate that the only genuine issue remaining in this matter is whether substantial evidence supports the ALJ's determination regarding the pain and limitations that resulted from Plaintiff's fibromyalgia on or before September 30, 2000, and whether it, singly or in combination with her other impairments, rendered her disabled on or before September 30, 2000. The Court previously found substantial evidence supported all the ALJ's other determinations. Plaintiff did not object to or appeal the Court's decision. The Court previously did find that substantial evidence did not support the ALJ's determination regarding Plaintiff's fibromyalgia and remanded the case to the Commissioner for specific findings regarding this issue. The Appeals Council then remanded the claim back to the ALJ for further hearing and specific findings pursuant to the Court's Order. For the record, however, the

undersigned does find substantial evidence supports the ALJ's determinations at Steps one through five of the sequential evaluation.

In 1997, Plaintiff presented to Dr. Hanson for the first time in three years. She complained of a great deal of trouble with her neck and right shoulder. Dr. Hanson found Plaintiff was "very tender in trigger points about her shoulders & neck, consistent with fibromyalgia." The Court notes that, according to the U.S. National Library of Medicine and the National Institutes of Health, "Diagnosis of fibromyalgia requires a history of at least three months of widespread pain, and pain and tenderness in at least 11 of 18 tender-point sites." http://www.nlm.nih.gov/medlineplue/eny/article/00427.htm. (Emphasis added). These tender-point sites include fibrous tissue or muscles of the neck, shoulders, chest rib cage, lower back, thighs, knees arms (elbows), and buttocks. Dr. Hanson did not find 11 tender-points, yet, after seeing Plaintiff for the first time in three years, diagnosed fibromyalgia. The diagnosis itself was therefore not supported by the doctor's office notes. The undersigned further notes Dr. Hanson did not refer Plaintiff for any laboratory tests or x-rays, as suggested by the NLM/NIH to help confirm the diagnosis. Id.

Dr. Endrich prescribed Flexeril, corticosteroid injections from time to time as needed, strongly advised weight loss, and gave Plaintiff information on fibromyalgia "regarding exercise, etc." Plaintiff continued to complain of "significant problems with her fibromyalgia" during five office visits from October 1997 through April 1998. She stopped taking the Flexeril after the first visit, however, and took " a great deal of Ibuprofen" instead. She had two injections during this time period. There is no evidence that Dr. Hanson performed any other tests or treated Plaintiff in any other manner for fibromyalgia.

Plaintiff began treating with Dr. Endrich in March 1999, nearly a year after her last visit with

Dr. Hanson. Significantly, Dr. Endrich did not diagnose fibromyalgia at the time, but instead diagnosed osteoarthritis. He referred Plaintiff for x-rays and MRI's. Throughout 1999, there is no diagnosis of fibromyalgia by Dr. Endrich. In March 2000, Plaintiff asked for a referral to a rheumatologist. Dr. Endrich then diagnosed fibromyalgia and referred her to Ghassan Alayli, a rheumatologist.

On June 13, 2000, two months before her date last insured, Dr. Alayli examined Plaintiff. She reported she had been diagnosed with fibromyalgia two years earlier. Dr. Alayli stated: "apparently Dr. Hanson has diagnosed her in the past as having fibromyalgia and she wants to come here to see if she really has it and what she can do about it and can she be eligible for disability." It appears odd to the undersigned, as it did to the ALJ, that Dr. Endrich referred Plaintiff to the rheumatologist upon Plaintiff's request – something Dr. Hanson never did-- but she reported Dr. Hanson's diagnosis of fibromyalgia to Dr. Alayli. Significantly, Plaintiff reported to Dr. Alayli that she usually hurt when she was "overdoing things" like groceries or cleaning.

Dr. Alayli examined Plaintiff, finding she had fairly good range of motion of the cervical spine and no point tenderness of the lumbosacral spine. Her thoracic spine was unremarkable. She refused range of motion testing of the lumbosacral spine, but straight leg raising tests were negative. Her hands, wrists, elbows, and shoulders were unremarkable. Her hips had tenderness of the trochanteric bursa, but with good ranges of motion. There was crepitation of the right knee, but the left knee and both ankles and feet were unremarkable. Without mentioning any tender points, as required for a diagnosis of fibromyalgia, Dr. Alayli did diagnosis fibromyalgia and gave her a booklet on fibromyalgia. After Plaintiff read the book she told Dr. Alayli "it fit her to a great deal." Dr. Alayli then stressed the importance of exercise, telling her to do stretching exercises. He prescribed only

Pamelor and told her he "would usually encourage patients with fibromyalgia to be always engaged in employment if possibl[e]."

Dr. Alayli's is the last record before Plaintiff's date last insured of September 30, 2000. Although she was diagnosed with fibromyalgia, no doctor ever limited her in any way. In fact, Dr. Alayli, the rheumatologist, advised her to exercise and suggested maintaining employment. There are no further records regarding fibromyalgia until the State agency reviewing physicians' RFC's nearly a year later. Significantly, none of the State physicians found Plaintiff disabled and all opined that Plaintiff could perform work at the light and sedentary exertional levels.

Eight months after Plaintiff's date last insured, and ten months after her last recorded treatment for fibromyalgia, Plaintiff presented to Dr. Endrich with complaints of left hip pain for the past month. Dr. Endrich found she had tenderness over the trochanteric bursa and diagnosed trochanteric bursitis. He prescribed Ibuprofen. X-rays were negative. About a week later Plaintiff presented to Dr. Endrich with complaints of severe low back pain. Dr. Endrich diagnosed low back pain. The next report of fibromyalgia is nearly a year later, when Dr. Endrich diagnosed obesity, peptic acid disease, "history of" fibromyalgia, and small airway disease versus COPD secondary to ongoing nicotine use. The next month he diagnosed only depression.

In December 2004, four years after Plaintiff's date last insured, and after the case was remanded for findings regarding only fibromyalgia, Dr. Endrich, who had not diagnosed fibromyalgia until Plaintiff requested a rheumatologist consult, completed a "Physical Capacity Evaluation" form purportedly opining regarding Plaintiff's pain and limitations "as of or prior to 9/30/2000." On this form he found Plaintiff could have stood less than one hour in an eight-hour workday, walked less than two hours in an eight-hour workday, and sat less than three hours in an eight-hour workday four

years earlier. In other words, she would have been unable to perform an eight-hour workday at any exertional level under any circumstances.

As the ALJ found, no physician opined that Plaintiff was disabled before, or even after her date last insured, until Dr. Endrich's retrospective opinion four years later. No physician limited her in any way during the relevant time period. Dr. Alayli, the specialist, encouraged employment.

The Fourth Circuit has recognized that a treating physician can offer a retrospective opinion regarding the past extent of an impairment. Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991). It is long held that "an ALJ may not reject a treating physician's opinion, based on medical expertise, concerning the extent of past impairment in the absence of persuasive contrary evidence." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).

First, the undersigned finds, as the ALJ stated, Dr. Endrich cited absolutely no supporting medical evidence for his 2004 opinion. Further, as the ALJ also stated, Dr. Endrich's own records are during two periods – one, before she alleged her disability began and the other after her insured status elapsed. As the ALJ also found, Dr. Endrich's own records do not support the findings in his 2004 opinion, especially that Plaintiff would be unable to perform any work at all in 2000. Further, the 2004 opinion is also inconsistent with other persuasive contrary evidence, most significantly Dr. Alayli's examination, only two months before Plaintiff's date last insured, which showed fairly good range of motion of the cervical spine, no point tenderness of the lumbosacral spine, unremarkable thoracic spine, negative straight leg raising tests, unremarkable hands, wrists, elbows, and shoulders, tenderness of the trochanteric bursa but with good ranges of motion, and crepitation of the right knee, but unremarkable left knee and both ankles and feet. These findings are not consistent with an opinion that Plaintiff could perform no work, at any exertional level, at that time.

Even more significantly, Dr. Alayli did not limit Plaintiff in any way, and actually encouraged her to maintain employment, which is totally inconsistent with Dr. Endrich's findings four years later. The undersigned also finds it significant that Plaintiff told Dr. Alayli that she usually hurt when she was "overdoing things" like groceries or cleaning.

The three State agency physician opinions are also persuasive evidence contradictory to Dr. Endrich's retrospective opinion. All three opined that Plaintiff could work at the light and sedentary exertional levels. 20 CFR § 404.1527(f)(2)(i) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The undersigned therefore finds substantial evidence supports the ALJ's according little weight to Dr. Endrich's 2004 retrospective opinion. The undersigned also finds that substantial evidence supports the ALJ's determination regarding the limitations caused by Plaintiff's fibromyalgia, and his conclusion that her fibromyalgia, singly or in combination with her other impairments, permitted her to perform limited light and sedentary work and therefore did not render her disabled on or before her date last insured of September 30, 2000.

## VI. The Plaintiff's Contentions

Although the undersigned has already found substantial evidence supports the ALJ's decision, I feel compelled to address some of the *pro se* plaintiff's specific arguments regarding that decision.

Plaintiff first argues she is not capable of performing light or sedentary work, because such work is inconsistent with Dr. Endrich's opinion. The undersigned has already found, however, that

substantial evidence supports the ALJ's according little weight to Dr. Endrich's 2004 opinion. The three State agency physicians all opined that Plaintiff could perform work at the light or sedentary level, and as already stated, those opinions are required to be considered.

Plaintiff also argues that the ALJ agreed her fibromyalgia was severe; therefore, "how can it not be disabling?" Plaintiff, *pro se*, misunderstands the legal meaning of "severe" as applied by the Fourth Circuit. A finding that an impairment is "severe" does not mean that it is disabling. In fact, "an impairment can be considered as '<u>not</u> severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " <u>Brady v. Heckler</u>, 724 F.2d 914 (11th Cir. 1984). In other words any impairment which is more than a <u>slight</u> abnormality causing more than a <u>minimal</u> effect is generally considered severe. Therefore, the ALJ's finding that Plaintiff's fibromyalgia was severe means only that it was more than a slight abnormality that had more than a minimal effect on her, not that it was disabling or even "severe" under a common definition of the word.[2]

Plaintiff also argues that her testimony regarding how long she could sit was limited to sitting in a recliner with her feet elevated. Her testimony, even at the later hearing, however, was that she could sit about ten minutes at a time in a regular chair as opposed to the recliner. The ALJ's hypothetical to the VE included a sit/stand option and the VE testified there would be jobs available for an individual with Plaintiff's limitations, that would allow for sitting and standing at will, as long as the change in position was not continuous– in other words, as long as the individual could sit more

---

[2]Ex.: Severe- harsh; harshly extreme; serious; stern; grave, etc. <u>The American College Dictionary</u>, Random House, Inc. (1970).

than ten minutes at a time. The undersigned finds Plaintiff's own testimony that she could sit in a regular chair "about" ten minutes at a time substantially supports the ALJ's reliance on the VE's testimony in this regard. Even more significant is that, at the earlier hearing, in 2002 (already after her date last insured), Plaintiff testified she could stand for 20 minutes before she needed to sit, and could sit about 45 minutes before she needed to stand.

Plaintiff next argues that the ALJ improperly found her mental impairments were not disabling. As already found, however, this Court had previously decided that substantial evidence supported the ALJ's determination regarding Plaintiff's mental impairments, and that any further arguments regarding this decision had been waived. Nevertheless, for the record, the undersigned finds that substantial evidence does support the ALJ's determination that Plaintiff's mental impairments did not, singly or in combination with her other impairment, rendered her disabled as of her date last insured.

Plaintiff also argues that she did not know there was a time limit on filing for disability, and the fact that she did not apply for disability until a month after her date last insured should not make that big of a difference. Again, Plaintiff misunderstands. The fact that she did not apply for disability until a month after her date last insured did not make any difference at all to the decision. The claim was still decided the same as if she had filed it before her date last insured. Plaintiff did have to show that she was disabled on or before her date last insured, which she did not, in order to qualify for DIB benefits, however.

Finally, Plaintiff argues that the 4th Circuit found her fibromyalgia was severe. The Fourth Circuit, however, never heard this claim, as it was not appealed. Therefore, Plaintiff must be referring to United States Magistrate Judge Seibert's Report and Recommendation and United States

District Judge Stamp's Order affirming and adopting that Report and Recommendation. It is absolutely true that both judges found Plaintiff's fibromyalgia was severe. In fact, the ALJ himself had found her fibromyalgia was severe. As already discussed, however, an impairment can be severe without being disabling, which was the case in Plaintiff's claim.

## VII. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's application for DIB. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 18] be **GRANTED,** Plaintiff's Motion for Summary Judgment [Docket Entry 17] be **DENIED,** and this matter be dismissed and stricken from the court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to the Plaintiff *pro se* by certified mail, and to counsel of record.

Respectfully submitted this *27* day of May, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE